Filed 3/18/25  In re G.L. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re G.L., a Person Coming Under the Juvenile Court Law. | C100511 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.F.,<br><br>Defendant and Appellant. | (Super. Ct. No. STK-JD-DP-2021-0000497) |
| In re M.C., a Person Coming Under the Juvenile Court Law. | C100518 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.F.,<br><br>Defendant and Appellant. | (Super. Ct. No. STK-JD-DP-2021-0000100) |

1

Appellant M.F. (mother) filed these appeals involving her two children, G.L. and M.C. (together, minors), who are each other's half sibling.[1] Minors were detained at different times on separate petitions, but their cases eventually were heard and decided together. In both cases, mother appeals from the juvenile court's orders terminating parental rights and freeing minors for adoption. (Welf. & Inst. Code, §§ 366.26, 395.)[2] On mother's motion, we consolidated the appeals for purposes of oral argument and decision.

In both cases, mother contends that the juvenile court violated her due process rights by improperly appointing a guardian ad litem for her. She also asserts that the court erred in finding that the beneficial parental relationship exception to adoption did not apply. She additionally argues that the San Joaquin County Human Services Agency (Agency) and the court did not comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law because the Agency failed to contact certain known relatives about minors' possible Native American heritage and the court failed to make ICWA findings before terminating mother's parental rights.

G.L. filed a brief opposing mother's contentions in the appeal arising from his proceedings, case No. C100511. M.C. filed a letter brief joining certain of mother's arguments in the appeal arising from her proceedings, case No. C100518. The Agency urges affirmance in both appeals.

We reject mother's due process challenge to the appointment of a guardian ad litem and her claim that the evidence required application of the beneficial parental

---

[1] Although certain filings in this court bear a caption listing the younger minor's last name as beginning with a "K," the record confirms that this minor's last name in fact begins with the letter "L." We therefore refer to the younger minor as "G.L."

[2] Undesignated statutory references are to the Welfare and Institutions Code.

relationship exception. We conclude, however, that a limited remand to comply with ICWA is necessary in both cases.

BACKGROUND

I.

In March 2021, the Agency filed a section 300 petition on behalf of M.C., who was then three years old. The Agency alleged, among other things, that it had received a call reporting that mother was threatening to kill M.C. by slitting her throat with a pair of scissors and stating that she wished M.C. were dead or had never been born. The petition further alleged that when M.C.'s maternal grandmother, with whom mother and M.C. were living, took M.C. to a separate room for protection, mother went outside and urinated on the porch; when police responded, mother barricaded herself in a second-story bedroom and threatened to jump out the window. As a result of this incident, mother was placed on an involuntary psychiatric hold for one day, and M.C. was taken into protective custody pursuant to a protective custody order. The petition further alleged that mother was diagnosed with bipolar disorder for which she was not taking medication or receiving mental health services and that mother abused marijuana. The Agency asserted that mother's substance abuse and serious mental health issues impaired her ability to care for M.C. (§ 300, subds. (b)(1) & (g).) M.C.'s father's whereabouts were unknown.

The protective custody application stated in a section regarding ICWA that maternal grandmother said that she has Blackfoot and Cherokee heritage but is not a registered member of either tribe. The same day M.C. was taken into protective custody, the social worker assigned to the case completed an Indian Child Inquiry Attachment (Judicial Council Forms, form ICWA-010(A)) (ICWA-010(A)) form indicating that maternal grandmother had given reason to believe M.C. is or may be an Indian child. At M.C.'s detention hearing, mother stated that she had Native American heritage but did not know her tribal affiliation.

3

The juvenile court ordered M.C. detained and authorized visitation for mother. A few weeks after the detention hearing, mother completed two Parental Notification of Indian Status (Judicial Council Forms, form ICWA-020) (ICWA-020) forms indicating she and M.C. did not have Native American ancestry.

A contested jurisdiction hearing was held in May 2021. By then, M.C.'s alleged father had been located; he was incarcerated in state prison and not due to be released until 2030. He appeared at the hearing through appointed counsel. Maternal grandmother and mother testified, and the juvenile court found true all allegations in the petition, save certain allegations of drug use beyond marijuana. The court authorized a psychological evaluation of mother so that services could be tailored to her individual needs.

In June 2021, mother completed an in-person psychological evaluation with Dr. Sidney K. Nelson, who reported the following relevant information. Mother's "speech was clear and easy to understand," although she "spoke in a very rapid fashion" and often went off topic. There was "some evidence to indicate a formal thought disorder," as her "associations on occasion were loose." Mother reported a history of depression, anxiety, and significant mood swings. Her assessments suggested "significant thought dysfunction," "paranoid ideation," and "prominent persecutory ideation which likely rises to the level of paranoid delusions." After noting that it was "difficult to determine . . . whether she is delayed in terms of her intellectual skills," Dr. Nelson concluded that there "may be some mild impairment." Dr. Nelson noted "Diagnostic Impressions" of posttraumatic stress disorder, depressive disorder, schizophrenia, and bipolar disorder. He offered several treatment recommendations, including that mother receive a medication evaluation by a psychiatrist. In closing, Dr. Nelson opined that mother's evaluation suggested "significant psychological impairments." He would therefore be "very concerned" about her having unsupervised visitation with her daughter until her "psychiatric status becomes markedly improved."

4

The Agency filed a report ahead of the July 2021 disposition hearing. The report reflected that mother was one of 20 half siblings on the paternal side of her family. It identified by name M.C.'s maternal grandparents, two maternal aunts, one maternal uncle, and two other maternal "relative[s]." The social worker reported that she had sent a "family background questionnaire" to M.C.'s alleged father but had not yet received it back. In the ICWA status section, the report noted that the Agency had received correspondence from the Eastern Band of Cherokee Indians, dated May 7, 2021, indicating that M.C. was neither registered nor eligible to register as a member. The report also said that the Agency had received a letter regarding "Blackfeet Tribal enrollment records," stating that M.C. was not eligible for enrollment. Based on those letters, which do not appear in the record, the report concluded that ICWA did not apply.

At M.C.'s disposition hearing, the juvenile court adjudicated M.C. a dependent child of the court and removed her from mother's custody. It ordered reunification services for mother, including parenting education, individual counseling, and a psychotropic medication evaluation.

In November 2021, based on DNA testing, M.C.'s alleged father was declared her biological father. A supplemental disposition hearing was held in December 2021 to address disposition as to father. As relevant here, the supplemental disposition report stated that "[d]ue to time constraints, a family background as to the father was not obtained," adding that father had not returned the family background questionnaire that was sent to him. Based on the Agency's recommendation and the fact that father's anticipated prison release date exceeded the timeline for reunification, the juvenile court ordered father bypassed for reunification services.

## II.

At the end of November 2021, mother gave birth to a baby boy, G.L. G.L. and mother were discharged from the hospital together, but two weeks later a social worker visited them at maternal grandmother's house, where they were living, to investigate a

5

referral from the hospital. The referral was based on a belief that G.L. was at risk of abuse or neglect due to mother's unresolved mental health issues and the ongoing dependency matter with M.C. The social worker found mother prepared for and appropriate with the newborn, but after receiving further information from the social workers assigned to M.C.'s case, including Dr. Nelson's psychological evaluation, the Agency decided to seek a protective custody order for G.L. G.L. was taken into protective custody and placed in the same home as M.C.

The section 300 petition filed two days later alleged that G.L. came under the provisions of subdivisions (b)(1), (g), and (j) due to, among other things, mother's unresolved mental health and substance abuse issues, the circumstances resulting in M.C.'s dependency, and the unknown identity and location of G.L.'s father. G.L.'s father, who was not M.C.'s father, was known to mother only by his first name and had not had contact with her or G.L. since learning mother was pregnant. The Agency attempted to locate G.L.'s father, but its efforts were unsuccessful, and he was never part of the dependency proceedings concerning G.L.

The protective custody application for G.L. stated in a section regarding ICWA that maternal grandmother told the social worker at the referral visit that the family had Cherokee heritage but that she did not believe they belonged to any tribe. In an apparent reference to M.C.'s dependency proceedings, the application also stated that G.L.'s assigned social worker had "verified in the prior dependency case that written correspondence was received on May 7, 2021 stating that the minor does not fall under [ICWA]."

On the day G.L. was taken into protective custody, mother completed an ICWA-020 form attesting that G.L. is or may be a member or eligible for membership in a Cherokee tribe. The following day, the social worker completed an ICWA-010(A) form indicating that mother had given reason to believe G.L. is or may be an Indian child. The social worker also checked a box confirming that there had been contact with affiliated

6

tribes and wrote in the adjacent space: "It was confirmed they are not eligible in the last court report."

At G.L.'s detention hearing, mother denied any Native American heritage. The juvenile court ordered G.L. detained and ordered frequent visitation and weekly drug testing for mother.

At M.C.'s six-month review hearing in early January 2022, mother's counsel asked whether, in light of Dr. Nelson's psychological evaluation, the juvenile court would consider appointing a guardian ad litem to help mother. When mother stated that she did not believe a guardian ad litem would help, the court denied counsel's request. The court also denied mother's requests for M.C.'s return and for unsupervised visitation; it continued reunification services as recommended by the Agency.

In March 2022, the juvenile court held G.L.'s jurisdiction hearing. The court found true the petition's allegations as amended by the parties' joint agreement and ordered mother to participate in the county's dependency drug court.

Ahead of G.L.'s disposition hearing in April 2022, the Agency filed a report that asked the juvenile court to make a finding that ICWA did not apply to G.L. based on the Agency's declaration of ICWA tribal identification efforts. That declaration and its exhibits reflected that, in February 2022, the Agency sent ICWA notices regarding G.L. to the Bureau of Indian Affairs and three Cherokee tribes. The separately filed notices provided relative information about mother, maternal grandmother, and G.L.'s maternal great-grandmother. Two of the tribes responded that, based on the information provided, G.L. was not registered or eligible for membership. The third responded that, without information about G.L.'s biological father, it could not determine G.L.'s ICWA status, but it verified that none of the relatives listed on the notice was a registered citizen of the tribe.

At the disposition hearing, the juvenile court adjudicated G.L. a dependent child of the court and removed him from mother's custody.

M.C.'s 12-month review hearing was held the following week.  At the Agency's recommendation, the juvenile court again continued reunification services, adding an order for mother to continue her participation in drug court as ordered in G.L.'s case.

In July 2022, the juvenile court authorized both minors to be placed with an individual alternately identified in the record as M.C.'s paternal aunt or her paternal great-aunt.  A subsequent status review report reflects that minors were scheduled to be placed with this relative in August 2022, but she changed her mind about the placement on the day of the scheduled move.  In September 2022, minors were instead placed together in a new home with a nonrelative caregiver who was committed to their adoption should reunification fail.  This was G.L.'s second placement and M.C's fifth.

III.

For the remainder of the proceedings, the juvenile court heard minors' cases together.  In October 2022, the court held a joint hearing to set the date for a contested section 366.21 hearing for both minors.  After the Agency's counsel raised an issue with mother refusing to sign certain forms for G.L. to be assessed for developmental services (which she later signed), mother's counsel renewed her request for the court to appoint a guardian ad litem for mother.  Without any discussion, the court appointed as guardian ad litem for mother Amanda Pimentel, an attorney who was present at the hearing for that purpose.

Before the parties finished setting a date for the contested hearing, mother's counsel informed the juvenile court that mother wished to bring a motion under *People v. Marsden* (1970) 2 Cal.3d 118 to relieve her counsel, who was representing her in both minors' cases.  The court cleared the courtroom and held a *Marsden* hearing.  After the court questioned mother about the basis of her motion, mother's counsel explained that she was not the primary attorney appearing in mother's two dependency cases but stated, "I do have a question concerning [mother's] comprehension and, you know, reviewing the psychological evaluation[,] that kind of makes me feel that my concerns are valid, and

8

I think a [guardian ad litem] would be appropriate." In response to the court's questioning, mother stated that her counsel had not spoken to her about appointing a guardian ad litem and that she (mother) did not know what a guardian ad litem was. The following colloquy then ensued:

> "THE COURT: Okay, it is kind of like a go-between almost. It is a second attorney on your case and . . . if [mother's counsel] stayed on, she would be the lead attorney addressing the Court, and the second attorney would kind of be the go-between between you and her to explain things and communicate, things like that. That's why I appointed Ms. Pimentel today. She is your guardian ad litem. She's the go-between between the two of you.
>
> "[MOTHER]: The woman that just came out and spoke to me?
>
> "THE COURT: Yeah.
>
> "[MOTHER]: Okay."

The court denied the *Marsden* motion and expressed to mother, in closing, its belief that having a guardian ad litem was "really going to help . . . because that's the person who . . . has time to break stuff down for you and communicate what you are saying back to" mother's counsel. Throughout the remainder of the proceedings, a guardian ad litem appeared with and on behalf of mother.[3]

In November 2022, M.C.'s paternal grandmother completed an ICWA-020 form denying that she or M.C. were or might be members of or eligible for membership in any federally recognized Indian tribe.

---

[3] Although the juvenile court stated that it was appointing Amanda Pimentel as mother's guardian ad litem, over the course of the proceedings mother appeared through multiple different guardians apparently from the same law office. Because mother raises no issue with the identity of the appointed guardian, we refer to mother's guardian ad litem in the singular.

A contested joint section 366.21 review hearing took place on December 29, 2022, when M.C.'s case was at the 21-month mark and G.L.'s case was close to the 12-month mark. In the most recent status reports filed for each minor, the Agency recommended terminating reunification services.

Mother testified at the hearing that she had completed her parenting classes and 30 assigned therapy sessions for each minor; she stated that she had since continued doing therapy on her own with her therapist, Dr. Scott Howard. Mother further testified that she had twice been terminated from the drug court outpatient program for marijuana use, but she was currently back in the program and had stopped using marijuana. Mother denied having any underlying mental health issues, and she testified that her primary care doctor had told her to stop taking the psychotropic medication she had been prescribed. Mother described having "great" visits with minors, with whom she felt a "strong bond" and very much wanted to reunify.

On cross-examination, the Agency's counsel asked mother about concerns noted in several visits between August and November 2022. As relevant here, the visitation notes for September 9, 2022 state that mother was asking M.C. "too many questions" and M.C. was "getting very emotional." Mother told M.C. that M.C. needed to tell the social worker "to give her more visits," making M.C. "very confused." Mother then picked at one of M.C.'s earring holes until it started to bleed, and M.C. again became "very emotional." In her testimony, mother acknowledged making M.C.'s ear bleed but stated that she did not recall the rest. Mother also answered the Agency's counsel's questions regarding a November 30, 2022 visit about which the visitation notes describe mother criticizing M.C.'s clothes and then undressing her down to her underwear in order to change her clothes, while M.C. "looked uncomfortable, covering herself up with her arms." Mother testified that she had changed M.C.'s clothes item by item and that although other adults could have seen her changing, there was no one around and mother was blocking the view.

The social worker assigned to minors' cases also testified at the hearing. She testified that mother's visits continued to be a concern for the Agency. She acknowledged that mother had not tested positive for marijuana in approximately four months but felt that mother had not progressed despite completing most of the case plan because mother would not take accountability for her substance abuse and continued to deny having any mental health issues.

After hearing argument from all parties, the juvenile court terminated mother's reunification services in both cases. The court found this to be "a very troubling case" because there was no question that mother loved her children and had "attempted to do what she [could] to remedy the situation." The court recognized that mother had made "some progress," but it remained concerned that the significant mental health issues noted by Dr. Nelson still had not been addressed. Although mother had had "many, many good visits," the type of recently reported visitation problems should not have been occurring this long into the case; even after hundreds of visits, they had not progressed to unsupervised visitation. In addition, mother was still months away from completing drug court due to her positive tests, and she had not demonstrated an extended period of sobriety. The court found that "the underlying fundamental issues ha[d] not been adequately addressed" and thus determined that it could not return minors to mother that day. The court also concluded that this was not an appropriate case for a discretionary extension of the reunification timeline. The court therefore set a section 366.26 hearing, advised mother of her right to seek review by writ, and reduced her visitation with minors to once per week. Mother, through counsel, filed a writ petition seeking review of the court's orders terminating reunification services in both cases. This court denied the petition.

Both before and after the termination of reunification services, mother sent numerous emails to the social worker assigned to minors' cases on which she copied her attorneys and her guardian ad litem (once appointed). Shortly after reunification services

11

were terminated, mother emailed the social worker, her attorneys, and her guardian ad litem the names and phone numbers of two newly identified relatives who she said were willing to adopt minors. Mother identified them as her "cousins on [her] mom['s] side of the family," and she stated they were willing to permanently adopt minors. The record does not contain any response to this information, nor does it reflect whether the Agency ever contacted these relatives.

IV.

On January 10, 2023, mother's counsel filed a motion to set aside the December 29, 2022 order terminating reunification services based on the receipt of new evidence. The motion asserted that, on January 3, 2023, mother met with her guardian ad litem about the case and, for the first time, mentioned a "report" from Dr. Scott Howard, a psychologist she had been seeing since March 2022. According to the motion, mother told the guardian ad litem that the assigned social worker had told mother the report was not important to the case and mother "did not share this information with her attorney because of what her social worker told her." The motion argued that Dr. Howard would have been an important witness at the contested section 366.21 hearing because Dr. Howard held the opinion, contrary to Dr. Nelson's original psychological evaluation, that mother had been dealing with her mental health issues.

The motion attached a letter from Dr. Howard, dated December 30, 2022, that provided a "summary of today's visit and [his] recommendation(s)." In the letter, he stated that he had been seeing mother one-to-two times per month since March 2022; he also reported that mother was "not on any psych meds," and he did not recommend any as "[s]he is not psychotic [or] delusional." In his view, the symptoms reported in Dr. Nelson's June 2021 evaluation "do not match the person" he (Dr. Howard) had seen over the past year. Dr. Howard believed it could be "assumed that [mother's] past symptoms were due to substance abuse."

12

The Agency filed a written opposition to mother's motion and provided a declaration by the social worker denying that mother had ever told her that Dr. Howard had completed any type of psychological evaluation prior to the December 29, 2022 hearing. The Agency also attached copies of mother's emails with the social worker and with her guardian ad litem regarding sharing records of her visits with Dr. Howard, along with copies of the records themselves. One of the emails was a January 18, 2023 email from mother asking the guardian ad litem to provide her attorney with the medical records mother had delivered to the guardian ad litem's office five days prior, explaining that her attorney had called her the day before to say he had not yet received them.

In February 2023, after a brief hearing, the juvenile court denied the motion to set aside the order terminating reunification services. In March 2023, ahead of the section 366.26 hearing, mother filed a request for a bonding study as to both minors. The Agency opposed the motion, while minors' counsel believed a bonding study could be useful. The court denied the motion at a May 2023 hearing.

Also in May 2023, mother filed in each case a section 388 petition seeking modification of the December 29, 2022 order so as to renew her reunification services. Mother argued that since the order was issued, her visits had continued to go well and she was progressing with both therapy and drug court, which she had voluntarily resumed. She cited Dr. Howard's letter as evidence that she was addressing her mental health issues and argued that further services would strengthen her existing bond with each of her children.

The juvenile court denied the motion, finding that there were not sufficiently changed circumstances to show that it would be in minors' best interest to resume reunification services. The court then continued the section 366.26 hearing, in part because the social worker who had authored the original section 366.26 reports (prepared in April 2023) had since left the Agency and a new social worker had recently been assigned.

13

The new social worker prepared and filed supplemental section 366.26 reports for minors in October 2023. Like the original reports from April 2023, the supplemental reports recommended terminating parental rights and selecting adoption as the permanent plan for minors. The narrative section of M.C.'s supplemental report, which was incorporated into G.L.'s, reflected that mother's visits overall continued to be consistent and appropriate. It then catalogued 10 instances of concerning behavior by mother, from February 2022 to September 2023. For example, the report stated that, in January 2023, M.C.'s caregiver informed the Agency that mother was telling M.C. that M.C. was going to live with a cousin, which caused M.C. to cry and state she did not want to live with a cousin. During another visit later that month, "it was noted by the supervising staff that after visits with [mother], [M.C.] appeared to be very upset that her mom kept telling her that she was going [to] live with cousins that she doesn't know. [Mother] appeared to be very angry and [M.C. was] afraid of her and she never wants to go visit." In February 2023, the caregiver reported M.C. having behavioral issues after a visit, including crying uncontrollably and intentionally urinating on the floor. At a September 2023 visit, the observing social worker noted that G.L. was fixated on a tablet device for most of the visit, with "minimal interaction or engagement" with mother. The visit ended "without issue," and minors got in the car "while not appearing to express emotions such as sadness or crying." To the social worker, it appeared that mother's visits "lacked acts or moments of affection between the minors and the mother. The minors did not appear to go to the mother for hugs, kisses, be close to her, or express affection in words." The report additionally noted the caregiver's observation that M.C. had "expressed a disinterest in going to the visits."

The social worker opined that M.C. "may not benefit from continuing the relationship with the mother as she is five years old and struggles mentally, emotionally, behaviorally, and with her education." (M.C. was in fact six years old at the time.) The caregiver reported concerns about M.C.'s academics, "such as not understanding how to

14

spell out her name, struggling in math, and saying correct shapes." The social worker believed that "mother's patterns of behaviors and [being] emotionally unstable could possibly bring further disruption and detrimental impact toward [M.C.]'s mental health and well-being if the relationship continues. It appears that the mother[']s extensive, unresolved, and ongoing mental health and substance abuse related challenges since the onset of the minor coming to the agenc[y's] attention, has and may continue to overwhelm her ability to successfully address the critical needs of the minor." During the reporting period, M.C. was observed "bonding and comfortable with the caregiver," who had committed to adopting both minors. M.C. had also reportedly verbalized a desire to be adopted by the current caregiver and expressed that she enjoyed where and with whom she was living.

For G.L., the social worker opined that "although visits occur consistently for one hour each week, it was observed that [G.L.] was not benefiting from the visits, as evidenced by the minor not crying for the mother nor reaching out for the mother when she leaves the visits. There was no indication that minor is longing for the mother." The social worker "noted that the minor has been out of the mother[']s care since he was one month old, and per the undersigned's position, terminating the parental rights may not be detrimental to the minor." G.L. was "bonded with the caregiver," with whom he and M.C. had lived for over one year, which was "the majority of his life." G.L. appeared comfortable with the current caregiver and had been observed to look at her and say the word "Mom."

V.

In January 2024, after another continuance, the juvenile court held the section 366.26 selection and implementation hearing. The Agency called no witnesses, resting on the supplemental section 366.26 reports. Mother testified about how she raised minors, the quality of her visits with them, and their continuing closeness with her. She recalled how M.C. had told her that she (M.C.) slept with one of their photos under her

15

pillow so she would not forget her mother; M.C. would also bring mother things from the visitation center and ask her to take them home to keep safe for M.C. in her room. Mother testified that both minors called her "Mommy" and knew who she was. She viewed herself as bonded with both children. She believed that terminating her parental rights and breaking that bond would be harmful to M.C. because M.C. would think her mother did not care about her. It would also be "traumatizing" for G.L. because he knows who she is and would be hurt that he would no longer see the face he had known since birth. Mother additionally testified that she had been seeing Dr. Howard twice per month for the last three years, had been participating voluntarily in drug court for one year, and had attended 74 addiction recovery meetings since August 2023.

Before hearing argument from counsel, the juvenile court asked if there was "still an open question of findings as to ICWA." The Agency's counsel responded that there was but that it could be handled at a later date.

Mother's counsel and minors' counsel both argued that the Agency had not met its burden to show minors were adoptable, maintaining that their special needs were not adequately considered in their adoption assessments. Mother's counsel also argued that the beneficial parental relationship exception applied and that the juvenile court should therefore order guardianship rather than adoption.

After finding the adoptability assessments sufficient, the juvenile court found, by clear and convincing evidence, that both minors were likely to be adopted. As to the beneficial parental relationship exception, the court found that mother had "maintained very good visitation" with both minors. But having "reviewed all the visitation records, and the assessments, and reports on the relationship," the court did "not find that [minors] would benefit from continuing the relationship with [mother]" and found that termination of mother's parental rights would not be detrimental to minors. The court thus ordered parental rights terminated and minors placed for adoption. There was no further

16

discussion of ICWA at the section 366.26 hearing, and no ICWA findings appear in the court's written section 366.26 orders.

On February 16, 2024, mother filed a timely notice of appeal in each minor's case.

On February 29, 2024, with no record of a further hearing and at the Agency's request, the juvenile court issued "Findings and Orders Concerning Indian Child Welfare Act (ICWA)" for G.L. The court found that: there was a claim of Native American heritage but not sufficient information to give " 'reason to know' " that G.L. was an Indian child; notice had been given as required by ICWA and its California counterpart; and G.L. was not an Indian child within the meaning of ICWA.

While these appeals were pending and before briefing began, mother filed, and we granted, motions to augment the record in each case. As relevant, mother asked to augment the record in M.C.'s case with any tribal notice or responses from the tribes. The augmented clerk's transcript in M.C.'s case thus includes a Notice of Child Custody Proceeding for Indian Child (Judicial Council Forms, form ICWA-030) form for M.C., filed in April 2024, noticing a June 2024 hearing. The notice states that M.C. may have Cherokee heritage and lists partial information for numerous relatives on both sides of her family, specifying potential tribal affiliations for mother and maternal grandmother. For M.C.'s father, the notice lists his date and place of birth but states "[n]o information available" as to any tribal affiliation. The notice was sent to M.C.'s parents, the Bureau of Indian Affairs, and the same Cherokee tribes as G.L.'s earlier notice. No responses appear in the record.

## DISCUSSION

In each of these consolidated appeals, mother challenges the juvenile court's orders terminating parental rights on three grounds: first, that the way in which the court appointed her a guardian ad litem violated her due process rights; second, that the court erred in rejecting her assertion of the beneficial parental relationship exception to adoption; and third, that the court and Agency failed to comply with ICWA.

17

## I.

Mother first contends that the juvenile court violated her due process rights by appointing her a guardian ad litem without her consent or a showing of her incompetence. She argues that this was prejudicial error requiring reversal of all of the juvenile court's orders issued after the guardian ad litem's appointment at the October 2022 hearing setting the date for the section 366.21 hearing. The Agency and G.L.'s counsel argue that there was no error, or in any event, no prejudicial error. M.C.'s counsel takes no position on this issue.

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. (Code Civ. Proc., § 372; [citation].) The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.] The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing." (*In re James F.* (2008) 42 Cal.4th 901, 910 (*James F.*).) Before appointing a guardian ad litem for a parent in a dependency case, the juvenile court must hold a hearing at which the court or counsel "should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent." (*Ibid.*) "If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*Id.* at pp. 910-911.)

We see little indication in the record that the proceedings in the juvenile court adhered to these requirements. Although the court attempted to explain the concept of a

18

guardian ad litem to mother during a *Marsden* hearing, that explanation occurred after the court had already appointed a guardian, and the court said only that the guardian ad litem would serve as a "second attorney" or "go-between" for mother and mother's counsel. *James F.* makes clear that it is "inaccurate[]" to tell a parent that "the guardian ad litem was [her] 'second lawyer.' " (*James F.*, *supra*, 42 Cal.4th at p. 911.) In addition, the juvenile court did not explain that the effect of the appointment would be "to transfer direction and control of the litigation from [mother] to the guardian ad litem," which could include the ability to waive her right to a contested hearing. (*Id.* at p. 910.) Without this advisement, it is difficult to see how mother's failure to object reflected her knowing consent to the appointment. (See *In re Joann E.* (2002) 104 Cal.App.4th 347, 355 [absent evidence "that the significance of the appointment was ever explained" to the parent, court's brief exchange with her failed to establish knowing consent to guardian ad litem's appointment].) Moreover, although the record before us contains mixed evidence of mother's overall mental health, there is little evidence that she was unable to "understand the nature or consequences of the proceeding [or] to assist counsel in preparing the case." (*James F.*, at p. 910.) And in any event, the court made no inquiry sufficient to satisfy itself whether mother was, in fact, incompetent. (*Id.* at pp. 910-911; see *In re Samuel A.* (2021) 69 Cal.App.5th 67, 70 [due process violated where guardian ad litem was appointed "without any finding, let alone evidence, of [parent's] incompetence"].)

Still, we need not conclusively determine whether the juvenile court erred in appointing a guardian ad litem, because any error was harmless beyond a reasonable doubt. In *James F.*, *supra*, 42 Cal.4th 901, 915, our state Supreme Court held that a claim of "error in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding" is "amenable to harmless error analysis." (*Id.* at p. 919.) That is because, the court explained, "the use of flawed procedures in the appointment of a guardian ad litem for a parent does not inevitably and necessarily render dependency

19

proceedings unfair in any fundamental sense." (*Id.* at p. 918.) *James F.* did not prescribe a specific test for assessing whether such error is harmless but stated the general rule that reversal is not required for a due process violation "[i]f the outcome of a proceeding has not been affected" by the error. (*Ibid.*; see *In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93 (*Esmeralda S.*) ["It is unclear what is meant by 'the outcome of a proceeding' "].) *James F.* has since been interpreted to mean that "a juvenile court's violation of a parent's due process rights should be deemed harmless if the outcome of the review hearings and the termination hearing were not affected, rather than the outcome of the appointment of the guardian." (*Esmeralda S.*, at p. 93; see *id.* at p. 94.) Thus, contrary to mother's contention, a harmless error finding does not depend on a parent's incompetence being beyond dispute. Showing that a guardian ad litem would have been appointed regardless because of record evidence that the parent was incompetent is one way to establish harmless error, but it is not the only way. (See *James F.*, at p. 916; *Esmeralda S.*, at p. 94 [asking whether competent parent's "parental rights would likely have been terminated" despite due process violation].)

 *James F.* also did not specify whether "the question of prejudice should be analyzed under the standard for state law error stated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (a reasonable probability of a more favorable outcome), the more exacting standard for federal constitutional error of *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt), or some intermediate standard of prejudice." (*In re Samuel A.*, *supra*, 69 Cal.App.5th at p. 82, fn. 10, citing *James F.*, *supra*, 42 Cal.4th at p. 911, fn. 1 [declining to address precise harmless error standard].) The parties agree, and we assume without deciding, that *Chapman*'s harmless beyond a reasonable doubt standard applies.

 Under this standard, we conclude that the Agency has carried its burden to show that any error in the appointment of a guardian ad litem was harmless beyond a reasonable doubt. Mother contends that "had [she] been able to communicate with her

attorney directly," three improvements would have resulted. She asserts that her attorney would not have "missed" the fact that mother had been seeing her psychologist, Dr. Howard, for some nine months before the section 366.21 review hearing at which her reunification services were terminated—services that were terminated in part because the juvenile court did not believe she had addressed her underlying mental health issues. She also argues that her attorney would have sought writ review of the denial of her motion to set aside the order terminating reunification services, the denial of a bonding study, and the denial of her section 388 petition to renew reunification services. Finally, in her appeal concerning M.C., mother argues that, if she had been able to direct the trial strategy of the section 366.26 hearing, she could have requested to have M.C. testify regarding her feelings about terminating mother's parental rights.

We do not see evidence in the record that the appointment of a guardian ad litem played a role in these asserted defects in the proceedings. First, nothing in the record suggests that the guardian ad litem prevented mother from participating in the litigation or communicating with her counsel. This was not like the situation in *In re Samuel A.*, *supra*, 69 Cal.App.5th at page 77 in which the juvenile court ordered the parent "to communicate with her counsel only through her guardian ad litem." The juvenile court here imposed no such restriction, and the record makes clear that, even after the guardian ad litem's October 2022 appointment, mother continued to communicate directly with her counsel and the social workers by phone and email, sometimes simply including her guardian ad litem as an additional recipient on her email communications.

There is also no indication in the record that the appointment of the guardian ad litem in any way delayed or impeded mother's counsel's ability to learn of and present Dr. Howard's favorable evaluation and psychological counseling records. Mother could have told counsel of her sessions with Dr. Howard at any point between March and October 2022 before the guardian ad litem's appointment. As to Dr. Howard's December 30, 2022 letter, it appears that counsel could not have presented that letter for

21

the December 29, 2022 contested section 366.21 review hearing, regardless of the guardian ad litem's appointment, because, judging by the letter's date, it had not yet been written. To the extent an earlier favorable report from Dr. Howard existed, mother has only faulted her social worker—not the guardian ad litem—for dissuading her from telling her attorney about it. And ultimately, it appears that the guardian ad litem was the one who prompted mother's counsel to bring Dr. Howard's letter to the court's attention via the January 10, 2023 motion to set aside—after the guardian ad litem learned of its existence at a January 3, 2023 meeting with mother. Likewise, there is no evidence that the guardian ad litem's appointment caused mother's counsel not to seek writ review of the three orders preceding the section 366.26 hearing. Mother does not offer any theory as to how the guardian ad litem played a role in counsel's decision not to pursue review, and we see no indication in the record that the guardian ad litem blocked or dissuaded mother from urging counsel to file a writ petition.

Moreover, mother cites no instance in which the guardian ad litem exercised the power of direction and control of the litigation or waived mother's rights. Mother personally testified at each of the evidentiary hearings in both cases, each of which was contested. Indeed, the guardian ad litem offered substantive comments in court only twice in the entirety of the proceedings: once at the section 388 hearing regarding testimony that mother "wanted to clarify," and once at the section 366.26 hearing to try to help mother's counsel admit mother's drug court progress reports into evidence.

Finally, mother broadly contends that "the appointment of a guardian ad litem disrupted the flow of information from [mother] to her attorney," arguing that a court " 'cannot speculate how the imposition of the guardian ad litem as an intermediary may have impeded' " communication between a parent and her lawyer. Mother draws this language from *In re Joann E.*, *supra*, 104 Cal.App.4th at page 360, where the attorney had announced his intention to call an additional witness at an upcoming continued jurisdiction hearing, but when that hearing occurred—after the appointment of a guardian

22

ad litem—he did not present the additional witness. The court held that because it could not "speculate how the imposition of the guardian ad litem as an intermediary may have impeded the flow of information about beneficial witnesses between [the child's legal guardian] and her attorney," it could not hold the appointment harmless beyond a reasonable doubt. (*Ibid.*) Mother also directs us to two other similarly reasoned cases. In *In re Sara D.* (2001) 87 Cal.App.4th 661, 673, the appellate court held a guardian ad litem's appointment not harmless because the court could not guess at the potential effect of the testimony of three originally announced witnesses, who were not called after the guardian's appointment. And in *In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1189, the court held an erroneous appointment prejudicial because it could not be known "what [the mother] might have done or suggested to her attorney if the guardian ad litem had not been interposed."

We are unpersuaded by these cases to the extent they accept as sufficient prejudice speculation about how things might have been different without a guardian ad litem. That is because "a finding that the juvenile court's error [in appointing a guardian ad litem] was prejudicial must be based on a claim of prejudice rather than speculation of possible prejudice." (*Esmeralda S.*, *supra*, 165 Cal.App.4th 84, 96 [declining to "reverse a dependency judgment based upon speculation that an offending parent may have handled the case differently than his or her guardian ad litem"]; see also *People v. Gray* (2005) 37 Cal.4th 168, 230 [speculation cannot support reversal of a judgment].) The present case is also different from *Sara D.* and *Joann E.* in that, here, there is no indication that mother's attorney originally intended to take certain actions (such as calling particular witnesses) and then changed course after the guardian ad litem's appointment. We therefore cannot say that the appointment of the guardian ad litem "apparently affected the manner in which [the subsequent hearings were] conducted." (*In re Sara D.*, *supra*, 87 Cal.App.4th at p. 673.)

23

On the record before us, we are confident that the appointment of the guardian ad litem was harmless beyond a reasonable doubt.

## II.

Mother next contends that the juvenile court erred in selecting adoption as minors' permanent plan and terminating parental rights. In M.C.'s case, mother, joined by M.C., challenges the sufficiency of the evidence of M.C.'s adoptability. In both minors' cases, mother challenges the juvenile court's finding that the beneficial parental relationship exception to adoption did not apply.

## A.

A juvenile court may terminate parental rights if it determines by clear and convincing evidence that it is likely the child will be adopted. (§ 366.26, subd. (c)(1).) The court's determination of a child's adoptability must be based in part on the responsible agency's adoption "assessment." (§§ 366.22, subd. (c)(1), 366.26, subd. (c)(1).) The adoption assessment must include, among other things, "a statement from the child concerning placement and the adoption or legal guardianship." (§ 366.22, subd. (c)(1)(E).) And in all proceedings under section 366.26, the court "shall consider the wishes of the child" and act in the child's best interests. (§ 366.26, subd. (h)(1).)

Mother argues that the juvenile court's adoptability determination lacked sufficient evidence and violated her due process rights because the Agency failed to ascertain and report M.C.'s feelings about adoption. We review a determination of adoptability for substantial evidence, "considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We review de novo mother's due process claim. (*In re J.R.* (2022) 82 Cal.App.5th 569, 587-588.)

Mother acknowledges that, in the juvenile court, she made only a general objection to the sufficiency of the Agency's adoption assessment and "did not specify

that [M.C.] had not been asked about adoption." She correctly argues, however, that a substantial evidence challenge cannot be forfeited. (*In re B.D.* (2019) 35 Cal.App.5th 803, 823 [substantial evidence challenge is exception to general forfeiture rule]; *In re Erik P.* (2002) 104 Cal.App.4th 395, 399-400.)

There is substantial evidence that the juvenile court considered M.C.'s feelings on adoption in finding her adoptable. The supplemental section 366.26 report for M.C., filed ahead of the January 2024 hearing, contained a section for "Child's Statement Concerning Placement and the Prospective Adoption," where the social worker stated that M.C., who was then six years old, had "verbalized to [him] her desire to be adopted by the current caregiver and that she enjoys where she is living and whom she is living with." The narrative assessment section of that report also reflects that M.C. asked the social worker and the prospective adoptive parent when she could be adopted by the prospective adoptive parent. The clear statements in these reports, which the court stated that it reviewed, demonstrate that the Agency sufficiently reported and the court sufficiently considered M.C.'s feelings about adoption in making its adoptability determination. Mother does not challenge any other aspect of M.C.'s adoptability, and we note that M.C. was only six years old, had no major health concerns, and had a caregiver committed to adopting her. (See *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650 [discussing adoptability considerations].) Substantial evidence supports the juvenile court's finding that M.C. was likely to be adopted.

Given the adequate reporting and consideration of M.C.'s feelings on adoptability, we also reject mother's claim of a resulting due process violation. Even had there been some deficiency in the reporting of M.C.'s feelings about the termination of mother's parental rights, where an "assessment report is prepared, is available to the parties in advance of the noticed hearing, and does address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413, italics

25

omitted.)  Moreover, any due process violation could only be asserted by M.C., not by mother.  (See *In re B.D.*, *supra*, 35 Cal.App.5th at p. 824 [complete omission of component of § 366.26 report did not implicate parents' due process rights, given their adversarial position and attenuated liberty interest in custody of minor at § 366.26 stage].)  M.C.'s brief does not frame her argument in terms of due process, and in any event, the claimed defects here are not so egregious as to implicate her due process rights.  (Compare with *In re B.D.*, *supra*, at p. 824 [omitting records of foster parents' unfitness and abuse from § 366.26 report "so egregious as to rise to the level of a denial of due process" as to the minor].)

B.

Mother also contends, in both cases, that the juvenile court incorrectly found that the beneficial parental relationship exception to adoption did not apply.  The Agency and both minors disagree, as do we.

Under section 366.26, subdivision (c)(1), once a child is found likely to be adopted, the juvenile court "shall terminate parental rights and order the child placed for adoption."  When reunification efforts have failed, adoption—with its concomitant termination of parental rights—is " 'the legislative preference' " over alternatives like guardianship or long-term foster care.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [adoption is "the norm"]; see *In re K.H.* (2011) 201 Cal.App.4th 406, 414.)  Juvenile courts must therefore choose adoption and termination of parental rights as the permanent plan in all but those " ' "exceptional circumstances" ' " where the parent "can establish termination would be detrimental to the child under one of the statutory exceptions." (*In re Dy.P.* (2022) 76 Cal.App.5th 153, 163.)

The beneficial parental relationship exception to adoption requires a parent to establish, by a preponderance of the evidence, "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child."  (*In re Caden C.* (2021)

26

11 Cal.5th 614, 629 (*Caden C.*); see § 366.26, subd. (c)(1)(B)(i).) We review a juvenile court's findings regarding the first two elements—regular visitation and a beneficial relationship—for substantial evidence and the court's "ultimate decision" on the third element for abuse of discretion. (*Caden C.*, at p. 640; *id.* at p. 639.) The juvenile court's determinations on the first two elements "should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.) In reviewing the juvenile court's exercise of its discretion, we do not substitute our own judgment when two or more inferences can reasonably be drawn from the facts. (*Id.* at p. 641.) A juvenile court "abuses its discretion only when ' " '[it] has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Ibid.*)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Here, the juvenile court found this element satisfied, and no party disputes its finding that mother "maintained very good visitation" with minors.

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i).) The "parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636.) The "focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.) In assessing the character of the relationship, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

27

The juvenile court found this second element was not satisfied, and mother contends that the court's finding lacks substantial evidence. For G.L., mother cites evidence of his comfort with her, like falling asleep in her arms, her encouraging his physical development like rolling over, and him eventually calling her "Mama" or "Mommy." As to M.C., mother argues that she was "constantly interacting with [M.C.], complimenting her, encouraging her, and teaching her. She also fed her and did her hair. Later visits, [m]other helped [M.C.] learn to count with numbers and words to spell." The visitation notes support these claims and reflect positive, loving interactions between M.C. and mother: from the many visits in 2021 and 2022 noting M.C. hugging mother and twice making gifts for mother, to the January 2023 visit where M.C. (apparently unprompted) told mother, "I love you," gave mother a hug, and asked mother about her feelings. After January 2023, the visitation notes contain far less commentary but largely report appropriate visits with few concerns.

Still, this evidence does not negate the substantial evidence that supported the juvenile court's finding that neither minor would benefit from continuing the relationship with mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) For instance, there were several reports of mother's negative emotional impact on M.C. between late 2022 and early 2023. (See *id.* at p. 632 [one consideration for second element is positive or negative effect of interaction between parent and child].) Mother's September 2022 pressuring of M.C. to ask the social worker for more visitation time caused M.C. to become confused and "very emotional," and in November 2022, mother's semipublic undressing of M.C. caused M.C. discomfort (as it had in April 2022, when mother was previously corrected for this practice). In addition, when mother told M.C. at least twice in January 2023 that M.C. was going to go live with a cousin, M.C. experienced behavioral issues after the visit, crying uncontrollably and intentionally urinating on the floor. The visit monitor added that M.C. "is afraid of [mother] and she never wants to go visit."

28

Further, the juvenile court could reasonably conclude that M.C. did not benefit from her relationship with mother based on M.C. repeatedly expressing disinterest in the visitation sessions. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [another consideration for second element is how children feel about their parents].) The October 2022 status review report reflected that at one visit during the reporting period, M.C. had asked mother if she could have a shorter visit the next time. Visitation notes from October 2022 reported that while M.C. "always seems to enjoy the visits," "she never really wants to attend." And the supplemental section 366.26 report prepared in October 2023 relayed that M.C. had "expressed a disinterest in going to the visits." While these statements appear alongside more positive reflections of M.C.'s interactions with mother in the same or surrounding visits, the statements of disinterest still contribute to the substantial evidence supporting the juvenile court's conclusion on the second element.

The record even more clearly satisfies the substantial evidence standard with respect to the degree of benefit G.L. gained from his relationship with mother. G.L. had only lived with mother for the first two weeks of his life, and he could not yet verbally express himself during their visits, having only just turned two years old before the termination of parental rights. The juvenile court could reasonably find against mother on this element based on the minimal time he had spent in her custody and the fact that none of the visitation notes reflects him crying or appearing sad when taken back from mother at the end of their sessions. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318 ["beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].)

Even if the juvenile court's adverse finding on the second element was unsupported, we would still affirm because the court did not abuse its discretion at the third step in weighing the detriment to minors of losing their relationship with mother. For the third element—whether "termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent"—the parent "must show that terminating

29

that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634, 636, quoting § 366.26, subd. (c)(1)(B), italics omitted.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss," termination is detrimental. (*Ibid.*)

Here, it was reasonable for the juvenile court to conclude that mother had not shown that either minor's relationship with her was "so important" to either minor that the cost of termination would outweigh the benefit to minors of obtaining a final, stable, permanent custody arrangement through adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Both M.C. and G.L. spent significant portions of their lives outside mother's custody—roughly half of M.C.'s life and nearly all of G.L.'s. And while M.C. clearly enjoyed the majority of her visits with mother once there, she also repeatedly expressed disinterest in attending, as discussed above, and neither she nor G.L. were ever reported to have shown outward signs of sadness or hesitation to leave at the end of those visits.

At the same time, both minors were reported to be happy with the prospective adoptive parent, who had provided stability for them for over one year before the section 366.26 hearing. G.L. was noted to be "bonded with the caregiver," with whom he appeared comfortable and had been observed to call "Mom." M.C. was "bonding and comfortable with the caregiver." While we recognize mother's testimony predicting that M.C. would feel abandoned if she could no longer see her mother, that is not enough to

30

show that a finding that this harm would not outweigh the benefits of adoption reflects an abuse of discretion. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

III.

Mother's final contention is that the juvenile court failed to assure compliance with ICWA in each minor's case. On this point, we conclude that conditional reversal is required.

ICWA "protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings." (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) Under ICWA's state analogue, the California Indian Child Welfare Act (§ 224 et seq.) (Cal-ICWA), "courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*); § 224.2, subd. (a).)

"This 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' " (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132.) "When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e); see also [Cal. Rules of Court,] rule 5.481(a)(4).)" (*Id.* at p. 1132, fn. omitted.) "If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes. (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).)" (*Id.* at p. 1133.) If, instead, the juvenile court finds no reason to know the child is an Indian child and finds "that an agency's inquiry and due diligence were 'proper and adequate,' " the court may

31

make a finding that ICWA does not apply. (*Dezi C.*, at p. 1134, quoting § 224.2, subd. (i)(2).) The court may not "find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child welfare agency] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408.)

A finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

Mother contends in M.C.'s case that the Agency failed to comply with the initial inquiry requirements of Cal-ICWA because the Agency did not inquire of M.C.'s father or certain extended paternal family members as to M.C.'s possible Native American ancestry. Mother also argues, with respect to both minors, that the Agency had " 'reason to believe' " minors were Indian children but failed to make further inquiry into their ancestry with certain extended family members on mother's side. She additionally maintains that the juvenile court failed to make the required ICWA finding with respect to both children before ordering termination of parental rights. M.C. joins in mother's arguments as to her case. G.L. and the Agency urge affirmance.

In every case, the juvenile court must make a finding as to whether ICWA applies. (*H.A. v. Superior Court* (2024) 101 Cal.App.5th 956, 965; *In re E.W.* (2009) 170 Cal.App.4th 396, 403.) This finding may be express or implied, but we will recognize an implied ICWA finding only when we "can be confident that the juvenile

32

court considered the issue and there is no question but that an explicit ruling would conform to the implicit one." (*In re E.W.*, *supra*, at p. 405.) The California Supreme Court has implied an ICWA finding where, "without such a finding, [the court's] obligation would have been to order further inquiry to ensure that the appropriate tribe had notice and was given the opportunity to intervene before the court terminated parental rights and approved the adoption plan." (*In re Kenneth D.*, *supra*, 16 Cal.5th at p. 1101; see also *Dezi C.*, *supra*, 16 Cal.5th at pp. 1137, 1141 [reviewing implied finding].)

In this case, at the time the juvenile court terminated parental rights, it had not made an express finding regarding ICWA for either minor. Indeed, after the detention hearings in both minors' cases, the court did not mention ICWA again until the section 366.26 hearing. At that hearing, the court only asked whether it still needed to make ICWA findings and was assured by the Agency's counsel that it could do so later. The court eventually made a written finding that ICWA did not apply to G.L., but this finding was made after the order terminating parental rights, after mother had already appealed, and without a further hearing. As far as the record discloses, the court never made an express ICWA finding as to M.C.

On this record, we lack confidence that the juvenile court considered whether ICWA applied to either minor before terminating parental rights. (See *In re E.W.*, *supra*, 170 Cal.App.4th at p. 405.) Unlike a case with a silent record concerning potential ICWA findings (*In re Kenneth D.*, *supra*, 16 Cal.5th at p. 1101; *Dezi C.*, *supra*, 16 Cal.5th at pp. 1137, 1141), here the juvenile court acknowledged at the section 366.26 hearing that there remained an "open question of findings as to ICWA" in both cases, yet appeared to accept the Agency's counsel's assurance that it need not address ICWA at that time. These facts suggest that the juvenile court affirmatively declined to make an ICWA finding for either minor before terminating parental rights.

33

On remand, in each minor's case, the juvenile court must make a finding whether ICWA applies after satisfying itself that the Agency has conducted the required inquiry. In M.C.'s case, the record suggests that the Agency never asked her father or her father's counsel, who was present at each of M.C.'s hearings after her father was located, about M.C.'s possible Native American heritage; nor does it appear that the Agency inquired of M.C.'s paternal aunt/great-aunt, despite having been prepared to place minors with her at one point. (See § 224.2, subd. (c) [inquiry shall "be made at the first appearance in court of each party or interested person" and "shall occur on the record"]; *Dezi C.*, at p. 1140 [" 'operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked' "].)

In addition, in both minors' cases, mother and maternal grandmother stated early on that they believed they had Native American ancestry. Although mother also denied Native American ancestry around the same time, mother's and maternal grandmother's affirmative statements were sufficient to trigger the Agency's duty of further inquiry. (*In re E.C.* (2022) 85 Cal.App.5th 123, 147 [report of possible Native American ancestry is sufficient]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [noting "reality that parents may not know their possible relationship with or connection to an Indian tribe" and explaining that fact that a parent "disclaimed any Indian ancestry at the outset of the dependency proceedings did not end the [child welfare agency's] duty of inquiry, especially where relevant contact and identifying information was readily available"].) Under Cal-ICWA, the duty of further inquiry includes, but is not limited to, "[i]nterviewing the [child's] parents . . . and extended family members" to gather the information required for an ICWA notice, and "[c]ontacting . . . any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(A) & (C).) The record here suggests that the Agency did not question minors' maternal great-grandmother or the two individuals mother identified as

her cousins who wished to adopt minors, despite having received contact information for each of them. While these individuals do not appear to come within the statutory definition of an " 'extended family member' " (25 U.S.C. § 1903(2); § 224.1, subd. (c)(1)), it appears they could "reasonably be expected to have information" regarding minors' eligibility for membership in a tribe (§ 224.2, subd. (e)(2)(C)), and all were reasonably available for the Agency to contact (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140). In addition, although the Agency asserts that its family-finding efforts only returned paternal relatives for M.C., the Agency's June 2021 disposition report for M.C. identified by name several maternal relatives besides mother and maternal grandmother. On remand, the Agency is to make inquiry and documentation efforts consistent with its duties, and the juvenile court "shall hold a hearing thereafter to determine whether, in light of the outcome of the inquiry as documented, ICWA applies." (*Dezi C.*, at p. 1137.)

## DISPOSITION

The orders terminating parental rights and selecting adoption as the permanent plan in both cases are conditionally reversed, and the matters are remanded for the limited purpose of complying with the inquiry and notice provisions of ICWA as well as the requirements of sections 224.2 and 224.3 and the documentation provisions of California Rules of Court, rule 5.481(a)(5).  If the juvenile court thereafter finds a further inquiry was proper and adequate, finds due diligence has been conducted, and concludes that ICWA does not apply, the orders shall be reinstated.  If, however, the juvenile court concludes that ICWA applies, it is ordered to conduct a new section 366.26 hearing and proceed in accordance with ICWA and California implementing provisions.


      /s/
FEINBERG, J.


We concur:


  /s/
EARL, P. J.


  /s/
MESIWALA, J.

36